Miller, where are you? Maybe she's not here. We're glad to have you, your class, and I hope we get a chance to speak to you at the conclusion of oral arguments. We're glad to have you here. Students from Washington and Lee. All right. Brignac, whenever you're ready. Thank you, Your Honor. May it please the Court, Eric Brignac for Marcus Byrd. Marcus Byrd, who's currently serving a life sentence, even though his trial wasn't fair. He was not allowed to cross-examine the government's key witness against him, Robin Applewhite. This rendered his trial both unfair and unconstitutional. This Court must vacate the jury's verdict on counts one through four and remand for a new trial on those counts. We know that Robin Applewhite was a key witness because the government believed he was a key witness. If you look at the government's opening argument to the jury, they talk for five pages in great detail about Robin Applewhite and only then talk for one paragraph about Marcus Moore, one paragraph about the police officers. We know here what the government knew then, which was that this case rose and fell with the government. Marcus Byrd, who was serving a life sentence, specifically mentioned two things that are relevant to the question of whether Robin Applewhite's lack of cross-examination was harmful. First, he mentioned to the jury that when you're doing a criminal investigation, you always go up the chain. So he gave the jury the implication that whatever Robin Applewhite was accused of, and we were limited to calling them serious charges, had to be something less serious than what Marcus Byrd was accused of. As this Court knows, and as we know, and as the jury should have known, that was fundamentally untrue. Ossoff and Tompkins also explained to the jury the government's arresting and charging policies. He told the jury we would never arrest somebody based solely on the words of an informant. You would always need some sort of corroborating, some sort of direct investigation solely on the words of Marcus Moore. The only reason counts two and three were in this case, from our perspective, obviously I'm not in the prosecutor's head, but count one carried a mandatory life sentence. Why are counts two and three in the case? To bolster, to bring Robin Applewhite into this case, and to bolster the credibility of Marcus Moore, and to bolster, honestly, the credibility of the officers conducting this investigation. Officer Tompkins, on cross-examination, acknowledged that his investigation was sloppy. He mentioned he was new. He mentioned he was wet behind the ears. He mentioned when they were taking the inventory after Marcus Byrd's arrest, he forgot to look at some things. He mentioned when he was writing down the inventory of what was taken, he didn't put everything on the sheet. He tried to pass it off as a simple mistake. It wasn't a simple mistake, and what it did was make this officer look less credible in the eyes of the jury. He needed to be bolstered by someone else, in this case, Robin Applewhite. Officer Tompkins also cannot really be used to bolster Robin Applewhite, because he displayed real prejudice in front of the jury. He referred to Marcus Byrd as the bad guy, and the jury was aware of that. During appendix page 347, they specifically question, did Officer Tompkins really refer to the defendant as the bad guy? That question was never really resolved for the jury. It was not the district court's place to do that. What the government is going to want to do is to demonstrate that Robin Applewhite's any lack of cross-examination would be harmless, because he was observed by these police officers, and because Marcus Moore was really the person putting the drug weight on him for count one. This court cannot do that, because it does not accurately reflect what happened below. Robin Applewhite was the witness who got the audio tapes in front of the jury. Without him, those tapes wouldn't have been admitted, and without his credible testimony, the jury thought was credible testimony, about what occurred, the entirety of the case falls down. Marcus Moore, the jury knew, was a witness who was on federal probation when he committed these crimes. So the jury knew that Marcus Moore was a liar, and he was a good liar. He was able to fool his federal probation officer. Jury also understood that Officer Tompkins had demonstrated some prejudice. Officer also knew that Officer Tompkins was sloppy. So these are not the witnesses, don't, please your honors, turn this on its head. Don't use those other witnesses to bolster the credibility of the witness, Robin Applewhite, who again, I can't say it enough, was really the linchpin of the government's case. Can you go back to the tapes, because the drug transactions are on tape, right? Yes, your honor. Okay, and so, explain to me, it just went too fast for me, explain to me. I'm sorry, your honor. No, no, it's okay, it's early. Explain to me why Applewhite's testimony that he had these transactions with the defendant, even if you think there was some error involved, why it's not harmless in light of the fact that the transactions are also on tape. Thank you, your honor. It was not harmless because the phrase on tape covers a wide variety, and we know from this wide variety of circumstances, and we know from these records that these videotapes were not good, and the officer's observations were not good. On Joint Appendix 115, Officer Tompkins testifies, the video is very grainy. It's taken with a cell phone. Joint Appendix 105, he says, you know, the video is on the poor side. They specifically mention, regarding the second alleged drug transaction, that they basically couldn't really see what was going on, because the position the officers had to take to take this videotape was behind a fence. But the jury saw all that, didn't they? They could decide whether it was worth believing or not. Well, your honor, I would say just to finish, the jury saw that, yes, and they saw that those videotapes, you know, were of poor quality. They heard that. Joint Appendix 209-210, the officers acknowledged they couldn't even see the cars at the second drug deal. So the jury relied on Robin Applewhite, the witness who was there, the witness who was not. Yes, your honor. Didn't they also hear testimony that they had sent Applewhite in to do this transaction and searched him before he went in and he didn't have drugs? And then when he came back, he did have drugs. Wasn't there a sort of independent testimony about that? Yes, your honor, there was. And, your honor, I would say, first of all, that testimony relies in part on the testimonies of the officers, officer Tompkins explaining that who had already demonstrated bias and already demonstrated sloppiness to the jury. And Robin Applewhite confirmed that. So, yes, they say he was searched. And, you know, that's a fact we're stuck with. But we don't know the thoroughness of that search. And we don't know what Robin Applewhite, who, if I may editorialize, is an incredibly slippery individual, may have managed to do. Again, the officers, Joint Appendix 209-210, acknowledge they couldn't see Mr. Byrd's car at the second drug deal. They don't know who else was there. They don't know what else Robin Applewhite was doing. And to the extent this court believes that it was erroneous, that we were not allowed to cross-examine the witness fully as to his incentives, his prejudice, the government has the burden of demonstrating that that was harmless. And that's what the government cannot demonstrate. It's not up to us to prove that it was harmful. It is up to the government to prove that it is harmless. And certainly, Your Honor, I'm not going to stand here and pretend that the officers, having searched him and there being some grainy videotape and the like, is irrelevant to that inquiry. But it still doesn't rise to the level of what we should have had the right to do, which was really cross-examine Robin Applewhite. And I can say, Your Honors, I was on that trial team. This wasn't a situation where we were going to ask him two questions, you know. Oh, and isn't it true you have some pending charges? Okay, moving on. This would have been in our opening. This would have been sort of the core of his cross-examination. This would have been in our closing. I mean, this was the trial strategy. The government's main witness was facing incredibly serious charges, in my mind, an order of magnitude greater than the charges Mr. Byrd was facing. And he had every incentive to lie. And his character and his ability to cross lines and have a crime of moral turpitude and to do that would have been relevant. And we just wanted the opportunity to explain that to the jury. And that was pulled from us.  The charges were dismissed. We would point out that, you know, those dismissals were simply a month before trial, long after trial preparations had begun. And the government was the entity that sort of affirmatively represented to the district court that these were still pending charges. And actually, had the district court been aware that these pending charges, you know, some of them may have been dismissed because the government couldn't find their witnesses, that's what it said in the dismissals the government handed up, may have actually made it more likely that we would have gotten our right of cross-examination. It would have certainly undercut their argument that this would have shocked the conscience and inflamed the jury's passion. If it were just a risk, wouldn't Professor Weinstein and his treatise on evidence say that you just have to take his answer, you can't go beyond it? Did you commit a crime on such and such a day? If he says no, you've got to move on. Oh, Your Honor, we would have, I see no way we wouldn't have been stuck with his answer. How so? How so, if it was just an arrest? Well, Your Honor, my understanding, and again, I think you maybe have a better grasp on this than I do, but we would have asked those questions. He would have given us his answer. We wouldn't have been able to have a mini-trial about Robin Applewhite, but we could have asked him about these arrests and about his incentives for testifying. Not just, oh, you're facing serious charges, implying to the jury, probably along the lines of what Robin Applewhite's facing, but you're facing incredibly serious charges. You were arrested for this, and again, at the time, what we know and what the government represented was even, you know, the penalties for these charges are incredibly high, and again, you have every incentive to shade your testimony, and again, if you're willing to cross these lines, who knew what you did when you were working with the Cumberland County Police back in 2011? That's what we wanted to present to the jury. Would you have been content with just being allowed to ask what the maximum penalty was for each charge made against him, or did you have to get in the nature of the charge? Your Honor, the nature of the charge, to answer your question, we would have fought for what I think would have been easy, or what we were entitled to, which was the nature of the charges, because the nature of the charges, to some degree, gets to the willingness of the witness to cross certain lines. The maximum penalties, we would have liked to have that, too. Of course, as your Honor is aware, we didn't get to really do any of that. We got to say serious charges, and then you have an officer up there explaining to the jury that you always work up the chain, so whatever Marcus Bird is facing, Robin Applewhite must be facing less. They saw him do a couple of simple drug deals, and the jury also didn't know, of course, that Marcus Bird was facing a life sentence. I'm sure a lay juror would not have thought that whatever Robin Applewhite was facing was such a big deal, and the kind of thing that might incentivize him to commit perjury, or even previously to have worked with the Cumberland County Police Department in a way that wasn't according with his testimony. So I think the other, there's several issues in this case, your Honors. I think the other one that's probably most likely to get some relief on is the question of the armed career criminal sentence, and the government's obviously taking the position that he is not an armed career criminal, but nonetheless, this court shouldn't really notice that error. It should find it harmless. It should just let the incorrect judgment stand. If a person is wrongfully convicted of one of multiple charges, even though eliminating that charge may not affect his sentence, are there any other factors perhaps involving prison life where leaving that conviction as it is might impact the availability of treatment programs or custody status or things like that? Your Honor, exactly. That is a factor, and that's controlled by the Bureau of Prisons, and the Bureau of Prisons has internal regulations to decide who is eligible for certain programming, and what prison you get to stay in. Is it a high security? Is it a medium security? And again, these are busy bureaucrats, and they're going to flip and see the judgment. Is there anything specifically you can point to that if this crime remains on his record, he can't do this? Can you be specific? In terms of internal BOP policy, I can research that, Your Honor, and submit something to the court. What I can be specific... Sorry, I thought you had a question. Your Honor, I might be wrong, and you can certainly correct me, but as to the ACCA contention, if we review it under plain error, there's no plain error because under the ACCA, he gets less than he really got, 15 as opposed to 30. I'm sorry? On the ACCA charge, the max was 15, right? For the ACCA charge, if he was not ACCA, he would have been 0 to 10. Ten years would have been the max because he was incorrectly found to be an armed career criminal. It was a 15 to life range. So the most he could have gotten there is 10. But to answer not in terms of BOP policy, Your Honor, but I think I mentioned this briefly in my letter response, and this is just something I can tell you, having lived through this for the last 11 years, all of these programs that come through, be they clemency, be they drug minus two, be they post Johnson relief, they all involve my office or panel attorneys or someone going through stacks of PSRs and looking to see who is eligible and who isn't eligible. And it's a team effort. We work on it. The U.S. attorney works on it. The probation office works on it. And one of the ways we get through stacks of PSRs in a timely manner is to have these sort of automatic things that make you ineligible. For instance, an ACCA sentence. Oh, this person's ACCA, they're not eligible for this round of whatever clemency it may be. Oh, they're not eligible for this sort of retroactive relief. So if, for instance, the future Congress decides that 851 is too harsh and a life sentence in the Bureau of Prisons for drug dealing isn't something that should be applied, this may be a factor. And this is the sort of thing where we assume judgments are correct. So if we're flipping and we get his judgment, we print it out and it says, oh, he's ACCA and eligible. Boom, that's it. We're asking this court only in the sense, and the reason you have harmless error is obviously to preserve judicial resources, which we all take very seriously. There's not much judicial resource expended in just correcting a judgment. Just correct the judgment to say what's true, what the government acknowledges is true, which is that Mr. Byrd's not an armed career criminal. That is something that I think this court should do, and his judgment, which is going to be with him for the rest of his life in the Bureau of Prisons, assuming that this court does not agree with us on our other points, that judgment's with him, and we're just asking that it be correct. And no one is saying it is correct. And again, that would not involve a new trial. That would not, to my knowledge, even involve a new sentencing. That would be a correction of the judgment to correctly reflect the fact that Marcus Byrd's not an armed career criminal. Of course, because he got an unfair trial, I don't think he's guilty of counts one through four. But again, to the extent this court does not agree with that, at least please let his judgment correctly reflect the sentence he received and his status. But just so I'm clear, currently there's no sort of practical collateral consequence to this additional sentence. Is that right? There's nothing you can point to, like right now. Right now, Your Honor, no, I would appreciate the opportunity, and I will do this research, to see if there is some internal Bureau of Prisons designation. But right now, no. It's speculative. It's based on the fact that I've been in that office for 11 years, and we've already had five rounds of some sort of post-sentencing collateral retroactive type relief. So I don't see that stopping. If there are no more questions, thank you. May it please the Court. Christine Fritz on behalf of the United States, and I'm asking you to affirm the judgment and conviction in this case. And I'd like to touch very briefly upon the point that we just left with, before moving to the other trial-related issues. At this point in time, with regards to any harm suffered by an act of designation, the defendant has acknowledged that it is speculative. To say that a defendant can meet his showing of prejudice, he has the burden of showing that his substantial rights were affected. To say that it's possible that at some point in time in the future he may somehow benefit from a law Congress passes, that would just completely stretch the limits of plain air review. Can I just ask you, though, so what is the big deal, right? Everybody, just in practical terms, everybody concedes this judgment is incorrect. He's got this sentence sitting, an ACCA-enhanced 15-year sentence that nobody thinks should be on his record. What's the government's interest in not having a correct judgment and getting the paperwork right? What I can say, Your Honor, is that my office has repeatedly sent cases back where something had been Simmons-infirmed or Johnson-infirmed, and it affected the defendant. But I'm saying even if you think it doesn't affect the defendant, I mean, it's the government's put someone in prison for life. Shouldn't the paperwork be correct? I think that, again, he has to bear the burden. And if this Court, first of all, the government has acknowledged that an error has happened. So going forward with respect to potential prejudice, I'm not sure if I see where that would be. If the parties agree that he's not ACCA and this Court makes that opinion that he's not ACCA, I would think that that would satisfy any potential prejudice. Well, one would hope, right? But Bureau of Prisons is a tricky place, and it's going to be difficult once this direct appeal is over for a prisoner in a Federal facility facing some kind of BOP thing to get that case back in front of a court to get it adjudged. So why not just clean it up now? And I'm just wondering, is there a practical I totally understand your legal argument, but just practically speaking, what is the big deal about just getting some white out and taking that off his record? I guess the government approaches it from a slightly different perspective, because obviously if the defendant has suffered some harm, if he had showed that he had suffered some harm in this case, we would have sent it back. Well, the test would be, has his substantial rights been affected? I'm not necessarily disagreeing with my colleague about cleaning it up, but correct me if I'm wrong. He's serving a mandatory life sentence and a 30-year concurrent sentence in addition to the 15-year ACCA sentence. Correct. So how are his substantial rights affected under a plain error analysis? We shouldn't show some sympathy or empathy. Well, that's exactly our point, Your Honor. He's serving a mandatory life followed by a mandatory 25 years. And then concurrent with that are the sentences on the drug convictions, the 30 years. So our position is simply that when there is an error that harms a defendant, absolutely, this court should correct it. Our position is simply that under this standard where the defendant had agreed at the time that he was ACCA and isn't suffering any harm, he hasn't met that burden. And more recently in the McDonald case, this court in a published opinion applied an assumed error harmlessness type analysis to a situation where a defendant had four convictions for felon in possession. The court said that it was giving him 188 months on all of the counts, and then made clear that if it was wrong about the ACCA designation, he'd still be getting 188 months. And here we think it's even more clear that he's not harmed because of the mandatory sentences and because this didn't affect his guidelines range. It didn't affect his maximum ultimate sentence. So our position is that absent some concrete showing of substantial rights being affected at this time, he simply cannot meet the burden. Now I'd like to turn to the defendant's argument about Robin Applewhite. Credibility is a jury question. It always is a jury question. And this is the first time I've heard substantial challenges to the credibility of the other witnesses in this case. And I want the court to focus on what was raised in this brief. The defendant has argued that his constitutional rights were violated because he was unable to cross-examine a witness. This witness was cross-examined. He had his confrontation right. He had his opportunity to confront the witness. And there was a substantial exploration of potential biases in impeachment. And for that reason, this isn't a constitutional violation. This is to be analyzed as a trial error. And the question is, if there was error, was it harmless? Now even if this court were to find that it's of a constitutional magnitude, the government maintains that we would satisfy a harmless beyond a reasonable doubt standard. And I'd ask the court to look at what the jury knew about Robin Applewhite before he even took the stand. We know that on May 2011, he was on federal release when he was caught with seven grams of crack cocaine, a distribution amount. We know that a federal judge learned of the cooperation and that he served about seven months on revocation and those state charges were dismissed pursuant to policy. We know that in February 2012, he was a paid informant. He primarily purchased trafficking amounts of heroin and earned over $7,000. He's arrested again and the Fayetteville Police Department refused to assist. And then later in 2014, they've reestablished contact with Applewhite because the FPD believed that he had important information that could be used. And the jury knew that at the time of the trial, August 2014, he had more pending charges. And that's what they knew, and that he was last paid from the FPD on July 11, 2014, the month before the trial. That's what they knew before he even took the stand. During the direct examination of Applewhite, the jury learned that he had served about five years on a federal gun charge. Again, he had pending charges, no promises or deals, and that he had previously made buys to work off state charges. During the cross-examination, the defense counsel was able to explore that he was a felon in possession and that was the federal charge. So we know that he had a felony predating his federal charge. Again, that he had a distribution amount of crack cocaine in his underwear. That he believed his involvement with the FPD, with the Fayetteville Police Department, had benefited him over time. That he, again, became an informant after the eight-month revocation sentence. And he was a paid C.I. through 2013 when he got in more legal trouble again. They were able to explore that he had serious pending charges and that he didn't want to go back to prison. When he's asked, as you sit here today, you have pending charges now of August 2014, right? Yes, ma'am. Now you don't want to go back to prison, do you? No, ma'am. No one does. Not that I know of. So we have a situation where the defense counsel has effectively laid the ground right to cross-examine Applewhite and show that he might have tailored his testimony out of self-interest. In fact, if you look at pages 411 and 412 of the closing arguments, that is exactly what defense counsel argued. That he is a man who will say anything to help himself. Anything. He's done it before. He'll continue to do it. He's paid right now to work for the Fayetteville Police Department. He gets charges over and over again. He has pending charges right now and has more pending charges the last time he was working with him. He has serious problems. So to suggest that there was an inability to cross-examine Robin Applewhite, it's simply not borne out by the record. The defendant might not have been able to get into the nature of the charges, but again, they were accusations at that time. These aren't prior convictions. This isn't a situation where he's been convicted of a crime of moral turpitude or dishonesty. These are accusations against a government witness. And everybody was well aware that he was a drug dealer. He was not an upstanding individual. You know, the more serious the charge, the longer the possible punishment, the greater the incentive for him to say what you want to hear. I would agree with that, Your Honor. And I think that when I looked back at the government's motions and our arguments, our concern was about certain charges, not just the drug charges. Your concern was about what? It was about certain of the charges. I think that the government was concerned about the inflammatory nature of an accusation of human trafficking or kidnapping. We now know that we were incorrect, and at that time, these charges were not pending. But I think you need only look at the defendant's opening brief to see why we were concerned about that. The opening brief talks about the government's willingness to work with a human trafficker and other things. That was exactly what we were concerned about. I think that had defense counsel said, we don't want to get into the exact title or substance of the crime, but we want to be able to ask the defendant, if we add up all the charges that you're facing right now, you could be in prison for the rest of your life. I think that's very different than saying, isn't it true that you've been accused of being a human trafficker? Isn't it true that you've been accused of kidnapping somebody? And I think the concern was that that was where the defense wanted to go. And I think that in some ways, the briefing in this bears that out. And again, I will reiterate, at the time Mr. Brignac and I briefed this, we did not realize that these charges had been dismissed prior to trial. And I do apologize for the somewhat late filing of those documents. Both defense counsel and myself had been aware of the charges having been dismissed back in September, before this original argument had been scheduled. And part of the reason I had looked into those charges in preparing for this case, I was curious what happened, quite frankly. So I don't want there to be any suggestion or belief that that was sprung on defense counsel, that that was surprising. We've known that for some time, and I think that had we recognized that earlier on, we probably would have taken a different approach in our motion in Lemonay. Because again, what it comes down to is that Robin Applewhite, who is an admitted drug dealer, a convicted felon, had a lot of drug charges pending. And they were felony drug charges. And he was asked, and it was explored, whether he might want to tailor his testimony. Now, if the court were to find that it was erroneous, that somehow this limitation on the cross-examination was error, I think the question becomes whether it was harmless. And generally, that asks whether, assuming the damage of a potential cross-examination, assuming that were fully realized, was there harm? And again, I think the mileage here on the cross-examination was limited by everything that the jury knew about Robin Applewhite. Other than specifying perhaps you could have been in prison for however many years if convicted of all these charges, I'm not sure what else, what mileage could have been gotten from that. Applewhite was a useful witness, but I wouldn't characterize him as a linchpin of this case. His testimony was corroborated in all material respects, both by law enforcement officer testimony, by audiovisual, and by pictures. He was supervised by officers when he made the calls to arrange the buys. He was thoroughly searched before the buy. Officers watched the defendant and Robin Applewhite interact as planned. And while it is true that they didn't actually see Robin Applewhite receive drugs from the defendant's hands and the money go the other way, the jury saw pictures of Robin Applewhite and the defendant, they saw this sequence of him getting in the car together, them getting in the car together for the first buy. And then for the second buy, they see the defendant, a photo of the defendant reaching in to the car where Robin Applewhite was. The jury saw this. And then Robin Applewhite goes to the buy, thoroughly searched, there's no drugs, and he comes back with drugs. And simultaneously to this, there's audio. And I would suggest that that audio, while obviously it was easiest to introduce it through Robin Applewhite who was part of the conversation, the individuals who were contemporaneously listening to that and those individuals who were familiar with the voices of the individuals on the tape, could have also authenticated those tapes. Those tapes could have come in. And the jury saw all of this. So when you look at what Robin Applewhite, a more robust cross-examination might have contributed, when you look at all of this corroboration, it's hard to understand why or how there could be harm. And that's the government's concern here. The district judge has wide latitude to impose reasonable limits. This was a reasonable limit based on what was known at the time. Now, another issue that the defendant presented in his brief is the sufficiency of the evidence with the 924C. And I would like to point out one or two things regarding that. In particular, I wanted to point out the conspiracy between Moore and the defendant being ongoing. And I was concerned a little bit, and perhaps I should have worded better in my brief, this idea that there were still financial obligations running between these parties. And I want to make clear that I've not given this Court or anyone the impression that the government is saying that any time an individual is in arrears on their drug dealing, that the conspiracy lasts in perpetuity. That simply wasn't the impression I was trying to give. Our position was that the conspiracy between Moore and the defendant was ongoing, and that in the circumstances of this case, the fact that these outstanding drug debts, they are relevant to show the ongoing nature of the conspiracy, because we know certain things about their relationship. We know that the defendant and Moore, Moore sold the defendant drugs on consignment. We know that Moore gave the defendant a couple of months to repay. And we know that the defendant was in arrears. Moore said, essentially, I would have to give him something else in order to get that back, what I had already given him. And in some ways, it's analogous in some ways to a credit card. The defendant had maxed out his credit with this supplier. Given the relationship, though, there's no reason to believe that had he gone and paid Moore back, that that relationship couldn't have continued. If you reach the limit on a credit card, you make the payment, and then you can continue the relationship. And that's why the limited time between the last fronting of drugs in March 2011 and the arrest in June 2011 is relevant. That was a reasonable time, and it was consistent with some of the repayment periods and with the fact that Moore had testified that he was simply not going to Fayetteville as often. We also know that after the defendant was arrested in June of 2011, he went to the defendant's mother's house, which was where he was residing, and gave the defendant $5,000 for attorney's fees. And he also put money in his canteen, $300 to $500. And that is around page 309. And we know that in the grand scheme of things, the $5,000 wasn't that big of a deal to Moore. And he was arrested with over $130,000. So when you look at all of the facts surrounding their relationship, they had a longstanding relationship. The defendant had been purchasing drugs from Moore for quite some time. He was in arrears, but Moore was helping with the attorney's fees and other things on the related drug charges. We would suggest that the jury could absolutely find that their business relationship was intact. And then you add to that the fact that the defendant identified Marcus Moore as one of his suppliers, somebody that he could buy for on behalf of the FPD. And he said that Junior was a person who he was getting drugs from. So when you have that background information, coupled with the defendant's acknowledgement that Moore was a continuing source, we think there's ample evidence to show that this relationship continued. And that the firearm that was possessed in the apartment, next to the drugs, next to the cocaine press, next to the money, that that was in furtherance of this ongoing drug conspiracy. If your honors have no further questions, I would ask that you affirm the judgment and the sentence of the court. Thank you. Thank you. Ladies and gentlemen of the jury, the drug business is a dangerous business. I don't need to tell you that. You see that on the news every night. Kids getting shot, random individuals in the wrong place at the wrong time who get in the way of drug dealers and their business. We inflame the passions of the jury. I was there. It wasn't 12 robots. It was 12 human beings. And I don't see why we are not allowed to appeal to their intellect, to their emotion, and to their common experience. That someone who a month before trial was facing charges for kidnapping and human trafficking might not be the most credible person there. Both intellectually because of what he knows he's facing and because of our common experience that generally when someone who is arrested for human trafficking tells you something, you're probably less likely to believe that than you would be otherwise. What about the fact the charges were dismissed? We know now they were dismissed. Yes, your honor. We know the charges were dismissed. We don't know actually, to get to Judge Floyd's point, if Robin Applewhite was even aware the charges were dismissed, he would have been in custody the entire time. I don't know what was communicated to him. But your honor, they were dismissed a month before trial. Well after his preparation and his working with the government and his decision to sort of enter into this was already part of the deal. And as far as we know from Robin Applewhite's point of view, you know, that was all part and parcel of the bargain he was making. He starts working with the United States attorney and lo and behold some of his most serious state charges get dismissed a month before trial. That's how he thinks the system is supposed to work. So, you know, that again, and this is the conversation. This is kind of what our closing argument would have been about. This is actually out of all the courtrooms here in Richmond. This is my favorite. But this isn't the courtroom where this conversation needed to happen. It needed to happen in the federal building in front of those 12 jurors in Raleigh, North Carolina. And again, just to say again, I think we know, at least we certainly contend that the lack of cross-examination was error. We all agree that the judgment is an error. And he's sitting there with a life sentence, with an incorrect judgment. And I would just urge this court not to simply resolve that on harmlessness. A life sentence is a big deal. Short only of death. You know, and if this were a death penalty case, this court has rules. You don't limit the scope of the briefs. You know, it's colloquially referred to as super-due process. The scope of the penalty has some bearing on how far this court's willing to go to say whether the government met its burden of harmfulness. It didn't. We ask this court to vacate the convictions on counts one through four and to eliminate the act of sentence on count five. Thank you. For the benefit of the class, we have a tradition on this court that at the close of arguments, we come down as judges to speak to the lawyers and say hello, a chance to, in effect, maybe renew some friendships or to say no hard feelings and then we go into the next case. Sometimes we have lawyers up here who are not familiar with our practice. If you're familiar with Erwin Chemerinsky, he came up and argued once. He's a famous constitutional law scholar. He didn't know about our tradition. He argued, went and sat back down and all of a sudden he said he looked up and the judges were coming at him and he thought, what did I say? He thought he was in trouble.
judges: William B. Traxler, Jr., Henry F. Floyd, Pamela A. Harris